UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Stampede Presentation Prods., Inc., | ) | CASE NO. 1:13 CV 1713 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| Vs. | ) | |
| | ) | |
| Westminster Technologies, Inc., et al., | ) | **Memorandum of Opinion and Order** |
| | ) | |
| Defendant. | ) | |

**INTRODUCTION**

This matter is before the Court upon Plaintiff Stampede Presentation Products, Inc.'s Motion for Preliminary Injunction and Expedited Discovery. (Doc. 8). Also pending is Defendants [sic]/Counterclaim Plaintiff Westminster Technologies Inc.'s Motion for Preliminary Injunction (Doc. 14). This is a trademark infringement case. The parties engaged in expedited discovery and the preliminary injunction motions are now ripe for review. For the reasons that follow, plaintiff's motion is GRANTED in PART and DENIED in PART and defendant's motion is DENIED. Westminster, Peck, and Premier, as well as their officers, agents, employees, and attorneys are hereby enjoined from using the Tap-it® mark. In addition,

1

Westminster and/or Peck must return to Stampede customer lists and contact information (including the hard drive with CCS's customer information that Peck removed).  Westminster is enjoined from using any such information, with the exception of information that is otherwise within the public domain.  Westminster and Peck must also return and cease using any marketing materials previously owned by CCS.  Stampede's request to enjoin defendants from marketing or selling any interactive learning device to any former customer of CCS is DENIED.

**FACTS**

Plaintiff, Stampede Presentation Products, Inc. ("Stampede") brings this action against defendants, Westminster Technologies, Inc. ("Westminster"), Gregory Peck, and Progressive Marketing Products, Inc. d/b/a Premier Mounts ("Premier").

In 1989, Defendant Peck started a company known as Cleveland Corporate Services, Inc. ("CCS").  In 2010, CCS began selling an interactive, touch-screen learning station, known as Tap-it®.

On April 8, 2010, CCS and Premier entered into a Development and Supply Agreement (" Development Agreement").  Premier agreed to assist in the development, design, and manufacture of the touch-screen learning station.  The Development Agreement specifically discusses the parties' respective rights to the intellectual property associated with the product. Paragraph 1.10 provides as follows:

> 1.10 INTELLECTUAL PROPERTY RIGHTS
>
> (a) Except as otherwise provided in this Agreement, [Premier] shall own all "Proprietary Technology" which shall be defined as: all tooling, inventions, improvements, discoveries, designs, data, concepts, ideas, processes, methods, techniques, know-how, and information respecting the Products conceived, made or produced by [Premier] during the course of performing design, engineering, fabrication, or manufacturing services under this Agreement, or made or produced as the result of the joint efforts of

>[Premier and CCS] pursuant to this Agreement.

>\*\*\*

>(c) Trademark.  Each Product delivered hereunder shall bear the appropriate CCS Trademark(s), including but not limited to the mark Tap-it® which shall be applied in the same manner CCS customarily applies it to such Product.  No right or license to any trademarks or trade name owned by either of the parties hereto shall be deemed to be granted to the other party....

>\*\*\*

During the design process, CCS and Premier collaborated on the design details.  Premier sought CCS's approval for certain aspects of the design.

In November of 2012, CCS filed a voluntary bankruptcy petition under Chapter 11.  In February of 2013, Huntington Bank ("Huntington"), a secured creditor of CCS, obtained relief from the bankruptcy stay, which permitted Huntington to sell the CCS assets in which Huntington had a perfected security interest.  Those assets included the tangible and intangible property rights related to Tap-it®.

Meanwhile, in March of 2013, Westminster was formed.  Westminster's employees are all former CCS employees.  Defendant Peck retained a hard drive with CCS's customer information.  In addition, Westminster continued to take orders for Tap-it® units and marketed the product.  Although initially interested in acquiring the rights to Tap-it®, it became apparent that those efforts would be unsuccessful.  Accordingly, Westminster began working with Premier to develop the Intelligence Touch Platform ("ITP").  Westminster claims that it markets and sells the ITP using its own logo and brand.  Stampede claims that defendant Peck improperly removed Tap-it® units from CCS's inventory and sold them to customers.

Around the same time that Westminster was formed, Huntington hired Stampede and Tiger Group, LLC ("Tiger") to liquidate CCS's assets. It appears that throughout the following three months, Stampede and Tiger in fact liquidated the assets. On July 10, 2013, Huntington and Stampede entered into a Secured Party Asset Purchase Agreement ("SPAPA Agreement"), pursuant to which Huntington agreed to sell to Stampede 140 Tap-it® units. In addition, Stampede acquired intangible assets related to Tap-it®. Specifically, Huntington expressly transferred to Stampede, among other things, any rights to the Tap-it® trademark and associated trade dress. The SPAPA provided that the sale was "as is, where is" which means that Stampede acknowledged that it performed its own investigation and inspection of the assets and is satisfied as to their value.

Some time thereafter, CCS filed a complaint with the U.S. Consumer Product Safety Commission asserting that the units posed a threat to safety after two screens broke. Ultimately, the Commission rejected the claim.

On August 5, 2013, Stampede sent cease and desist letters to Westminster's overseas distributors claiming that the ITP infringed on the Tap-it® trademark and trade dress rights owned by Stampede.

Thereafter, Stampede filed this lawsuit asserting eight claims for relief. Count one is a claim for trademark infringement and counterfeiting. Count two is a claim for trade dress infringement. Count three is claim for deceptive trade practices under Ohio law. Counts four and five are claims for conversion and civil theft, respectively. Count six alleges interference with business relations and count seven is a claim for unjust enrichment. Westminster filed a counterclaim containing seven claims for relief. Count one seeks a declaratory judgment that

4

Stampede owns no protectable rights to the Tap-it®.  Count two seeks a declaratory judgment that Premier is the lawful owner of any intellectual property rights associated with the Tap-it®. Count three alleges tortious interference.  Count four is a claim for violation of Ohio's Deceptive Trade Practices Act.  Count five alleges deceptive trade practices under federal law and count six is a claim for malicious litigation.  Count seven is a "claim" for injunctive relief.

The Court allowed expedited discovery.  Stampede and Westminster cross move for preliminary injunctions.  Both motions are opposed.

### **STANDARD OF REVIEW**

"When considering a motion for a preliminary injunction, the district court should consider four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *Rock and Roll Hall of Fame and Museum, Inc. v. Gentile Productions*, 134 F.3d 749, 753 (6th Cir. 1998).  *See also Memphis Planned Parenthood, Inc. v. Sundquist*, 175 F.3d 456, 460 (6th Cir. 1999); *Schenck v. City of Hudson*, 114 F.3d 590, 593 (6th Cir. 1997); *J.L. Spoons, Inc. v. O'Connor*, 190 F.R.D. 433, 437-438 (N.D. Ohio 1999); *Crews v. Radio 1330, Inc.*, 435 F.Supp. 1002, 1005 (N.D. Ohio 1977).

A district court must make specific findings concerning each of these factors, unless analysis of fewer facts is dispositive of the issue. *Six Clinics Holding Corp., II v. Cafcomp Systems, Inc.*, 119 F.3d 393, 399 (6th Cir. 1997).  However, not all the factors need be fully established for a temporary restraining order or injunction to be proper. *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997).  None is a prerequisite to relief; rather, they

should be balanced. *Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). While none of the factors are given controlling weight, a preliminary injunction should not be issued where there is no likelihood of success on the merits. *Michigan State AFL-CIO*, 103 F.3d at 1249.  Where the court concludes that there is no likelihood of success on the merits, it need not address the other three factors. *Id*.

### **ANALYSIS**

1. Trade dress rights

The primary dispute in this case centers on which party owns the trade dress rights associated with the touch-screen learning station originally sold under the Tap-it® trademark. This Court will address this issue first and then proceed to specific claims raised by each party.

According to both Westminster and Premier (sometimes, "defendants"), Premier owns the trade dress rights because those rights were contractually retained by Premier under the Development Agreement between CCS and Premier.  Because CCS never owned rights in the trade dress, Huntington's security interest did not extend to those rights.  As such, Huntington could not have sold Stampede trade dress rights because those rights were never acquired by Huntington.  On the other hand, Stampede claims that it owns the trade dress rights because it purchased those rights from Huntington, who acquired the rights by virtue of its security interest in CCS's assets.  According to Stampede, the Development Agreement cannot be read as broadly as defendants urge.  Stampede argues that the words "trade dress" never appear in the document. In addition, Stampede claims that the word "designs" does not equate with "trade dress" because the word is used in connection with the phrase "proprietary technology," which covers only Premier's role in the engineering and manufacturing process.  Stampede claims that Premier

6

never asserted any rights to the trade dress even though it attempted to bid on the Tap-it® assets. Stampede argues that, because the rights are not addressed in the contract, the Court should look to the actions of CCS and Premier to determine ownership rights to the trade dress. According to Stampede, the facts show that CCS is the rightful owner.

Upon review, the Court finds that defendants are likely to succeed in establishing that Premier owns the rights to the trade dress. As an initial matter, the Court points out that Stampede erroneously argues that "a product's trade dress is the same as a trademark." This statement is incorrect as a matter of law. As the Sixth Circuit has noted:

> [T]rademark and trade dress are two distinct concepts under the Lanham Act. The Lanham Act defines a trademark as "any word, name, symbol, or device, or any combination thereof" which is used or intended to be used by a person "in commerce ... to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127. By contrast, trade dress is not explicitly defined in the Lanham Act, but has been described by the Supreme Court as the "design or packaging of a product" which has acquired a "secondary meaning" sufficient "to identify the product with its manufacturer or source."

*Gibson Guitar Corp. v. Paul Reed Smith Guitars*, 423 F.3d 539, 547 (6th Cir. 2005)(noting that the district court "confused trademark law and trade-dress law when it concluded that the LP Trademark covered the entire guitar, rather than the two-dimensional silhouette included in the registration papers"). *See also, Pilot Corporation of America v. Fisher-Price, Inc.*, 501 F.Supp.2d 292 (D.Conn. 2007)(concluding that trademark owner that licensed trademark to manufacturer did not own dress rights in product).

Thus, "trade dress" is the "design or packaging" of the product. It "involves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *Abercrombie & Fitch Stores, Inc. v.*

7

*American Eagle Outfitters, Inc.*, 280 F.3d 619 (6th Cir. 2002)(citations omitted).

In this case, the Distribution Agreement specifically provides that Premier owns, among other things all "designs...conceived, made or produced by [Premier] during the course of performing design, engineering, fabrication, or manufacturing services under this Agreement, or made or produced as the result of the joint efforts of [Premier and CCS] pursuant to this Agreement."  The Court finds that this definition is broad on its face and encompasses trade dress rights.  Trade dress is fundamentally defined as the "design" of the product and the Distribution Agreement assigns rights to the design of the product to Premier.  This is so regardless of whether Premier conceived the design itself or with the help of CCS.

The Court rejects Stampede's argument that the phrase somehow *excludes* design functions.  According to Stampede, the phrase "design" is modified by the subheading "Proprietary Technology," and, therefore cannot include design functions.  This argument is not well-taken.  It appears that Stampede is claiming that design functions can never be considered "technology."  The Court disagrees with this argument in general, but more specifically, the parties chose to define "Proprietary Technology" to include the design of the product.

Stampede also argues that Section 1.10(c) of the Distribution Agreement precludes a finding that Premier owns the trade dress rights.  That section provides that the product "shall bear the appropriate CCS trademark(s), including but not limited to the mark 'Tap-it®.'" Stampede claims that because this language contemplates additional trademarks, it must necessarily mean that CCS retained the rights to the trade dress.  The Court rejects the argument. This language simply does not say what Stampede claims.  Rather, the language contemplates that additional trademarks may be developed by CCS and must be included on the product.

Nothing in this provision is inconsistent with a finding that the clear and unambiguous language in Section 1.10(a) vests ownership rights to the *design* of the product, *i.e.*, the trade dress, with Premier. Similarly, the Court rejects Stampede's claim that Section 3.3 provides that CCS retained the rights to the trade dress. That provision states that under certain circumstances, Premier could itself sell the product "being mindful of the trademark ownership rights of CCS in the name and brand Tap-it®." According to Stampede, this phrase means that CCS intended to retain rights *in addition* to the use of the phrase Tap-it®. Stampede argues that these "additional" rights in the "brand" Tap-it® must have included the rights to the trade dress. The Court disagrees. To the extent this provision could be construed to mean that CCS owned rights in addition to the trademarked name "Tap-it®", those rights do not extend to the trade dress. The clear and unambiguous language in Section 1.10, which is entitled "INTELLECTUAL PROPERTY RIGHTS" demonstrates that the parties agreed that Premier retained the rights to the design of the product.[1]

For the foregoing reasons, the Court finds that defendants have established a likelihood of succeeding on the merits in establishing that Premier owns the trade dress rights associated with the product. The Court now turns to the parties' individual motions.

2. Stampede's motion

A. Trademark and trade dress infringement

Stampede argues that it is substantially likely to prevail on these claims. The Court rejects Stampede's arguments with regard to the trade dress claims because, as set forth above,

---

[1] The fact that Premier may not have previously argued that it owns the trade dress rights does not change the Court's determination that the language in the contract is clear and unambiguous.

Stampede fails to show a likelihood of establishing that it possesses ownership rights to the trade dress.

With regard to the trademark infringement claim, defendants indicate that they are willing to agree to an injunction preventing them from using the Tap-it® mark. Accordingly, the Court GRANTS such relief.

### B. Tortious interference with business relations

Stampede argues that it is substantially likely to succeed on its claim for tortious interference with business relations. According to Stampede, Westminster is marketing "knock off" learning platforms to customers who previously contacted CCS about buying "Tap-it®" units. In addition, Stampede argues that Westminster continues to make use of the confidential customer lists and marketing materials of CCS that Stampede acquired from Huntington. With regard to irreparable harm, Stampede argues only the following, "[T]he competitive harm Stampede faces from Westminster's misuse of its confidential customer information also supports a finding of irreparable harm." Defendants do not address this claim. Therefore, the Court finds that injunctive relief is warranted. Westminster and/or Peck must return to Stampede any customer lists and contact information (including the hard drive with CCS's customer information that Peck removed). Westminster is enjoined from using any such information, with the exception of information that is otherwise within the public domain. Westminster and Peck must also return and cease using any marketing materials previously owned by CCS. Stampede's request to enjoin defendants from marketing or selling any interactive learning device to any former customer of CCS is DENIED. Stampede's request to prevent Westminster from selling the ITP to customers on this list is too broad. There is no non-solicitation

agreement and there is no indication that these potential clients are not generally known in the marketplace.

       3.  Defendant Westminster's motion

Defendant argues that it is likely to succeed on the merits with respect to all of its claims. Defendant's claims are all dependent upon the actions taken by Stampede to date.  Specifically, defendant complains about cease and desist letters sent to various distributors, including Premier. In the letters, Stampede demanded that the customer/distributor stop selling and then return any Tap-it® units in inventory.  Defendant argues that absent injunctive relief, it will suffer irreparable harm.  According to Westminster, as a result of these actions, it lost its sole supplier and is now unable to fill existing customer orders.

Upon review, the Court finds that injunctive relief is not warranted at this time.  It is undisputed that Stampede owns the rights to the mark Tap-it®.  Thus, Stampede is entitled to protect that right in the event it is infringed upon.  Here, Stampede provides evidence that the units sold by Westminster from April until the present bore the Tap-it® mark.  Accordingly, Stampede, as the owner of the Tap-it® mark, is entitled to protect its rights and the cease and desist letters cannot be considered interference or a deceptive trade practice.  On the other hand, to the extent the ITPs do not contain the mark, Stampede has no basis to interfere with Westminster's sale and marketing of that product.  However, since there is no indication that Stampede has attempted to interfere with Westminster's sale of ITP units that lack the Tap-it® mark, there is no basis for an injunction at this point.  For these same reasons, Stampede need not "retract" the cease and desist letters as requested by Westminster.

Westminster also asks the Court to "enjoin[] Stampede from misrepresenting in the

marketplace the origin of the subject products that may remain in the liquidations inventory of said products, the right/ability of Stampede to obtain and sell any such products in the future after the exhaustions [sic] said inventory, and otherwise damaging Westminster's good will in the market..." It is not clear what relief Westminster is requesting. However, it appears that the relief relates to Stampede's ability to sell existing and future Tap-it® units. Westminster, however, lacks standing to pursue such relief as it owns neither the trademark or the trade dress rights.

**CONCLUSION**

For the foregoing reasons, Stampede Presentation Products, Inc.'s Motion for Preliminary Injunction (Doc. 8) is GRANTED in PART and DENIED in PART as set forth above. Defendants/Counterclaim Plaintiff Westminster Technologies Inc.'s Motion for Preliminary Injunction (Doc. 14) is DENIED.

IT IS SO ORDERED.


    /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 10/3/13